HARRY N. BAETJER ET AL., Appellants, *v.* REGISTRAR OF PROPERTY OF GUAYAMA, Respondent.

No. 939. Submitted March 30, 1935.—Decided June 14, 1935.

*E. T. Fiddler, Jorge L. Córdova,* and *Jorge M. Morales* for appellants. The registrar appeared by brief.

Mr. Chief Justice Del Toro delivered the opinion of the court.

This administrative appeal has been taken by Harry N. Baetjer, Clarence K. Bowie, Fred C. Boyce, Louis S. Zimmerman, Harry E. Henneman, Burt O. Clark, and Earle T. Fiddler, as trustees of Eastern Sugar Associates of Baltimore, Maryland, and the National City Bank of New York, from a decision of the Registrar of Property of Guayama, which reads as follows:

"Record is denied of the foregoing instrument, which is deed number 87, executed in San Juan, on June 29, 1934, before Notary Jorge M. Morales upon examination of other instruments exhibited therewith, and especially deed No. 36 of March 27, 1934, executed before the same Notary, as it is noted that said deed No. 87 is subject to the following incurable defects: 1st.—Although the entity in this case, Eastern Sugar Associates, claims to be a business trust of the kind generally designated in the American decisions as *common law* or *Massachusetts trusts*, apart from the fact that such entity has no legal personality or civil capacity acknowledged by the laws of Puerto Rico, in view of its organic declaration (declaration of trust), the form and character of its organization and the form and manner in which it is to hold, administer, enjoy and dispose of the properties which are conveyed thereto, it is, in contemplation of Act No. 40 of April 23, 1928, relating to the incorporation and regulation of trust companies, a foreign trust company, and before doing any business in this Island it is bound to comply with the said Trust Company Law, a requirement which it has not shown to have fulfilled and, to judge from the character of its organization, it regards itself as exempt from any compliance therewith, without which compliance it lacks civil capacity to do business in Puerto Rico; 2nd.— In view of the declaration of trust of the said entity, its acquisition of the real property which is conveyed ,thereto in the foregoing deed is unlawful and contrary to Act No. 40 of April 23, 1928, relating to the incorporation and regulation of trust companies, for the following reasons: (*a*) All trust companies or foreign corporations are prohibited from acquiring, holding, or administering real property in trust in Puerto Rico, and they are likewise prohibited from directly or indirectly carrying on any business similar to the trust business; (*b*) a trust company being involved, and assuming that it were authorized to do in Puerto Rico the business which it proposes, the

properties acquired have not been conveyed to it directly by name and hence such property can not be recorded in its favor; (c) a trust company being involved, and assuming that it were authorized to do in Puerto Rico the business which it proposes, the manner in which the trust has been constituted in favor of indeterminate persons is contrary to the provisions set forth in Chapter III, Title III, Book Third, of our Civil Code; (d) even if it were assumed that strictly speaking the said entity can not be designated as a trust company, it is a foreign entity or company and, therefore, the prohibitions mentioned in the preceding subdivisions (a) and (b) are applicable thereto; 3rd.—Assuming that the said trust can not be characterized a foreign trust company, then, by reason of its form of organization, it is, in contemplation of our Private Corporation Law, a foreign corporation and in order to do business in Puerto Rico and before doing so it must comply with the said Corporation Law, a requirement which it has not shown to have fulfilled but on the contrary it considers itself as exempted therefrom, and without such compliance it lacks civil capacity to do business in Puerto Rico. 4th.—Considering the said trust as a foreign corporation, either in the light of our Law of Private Corporations or the Trust Company Law, and it intending according to its declaration of trust, to devote its activities to the exploitation of agricultural estates in Puerto Rico with the end in view of devoting the same to the cultivation of cane, the acquisition made for that purpose, by virtue of the foregoing deed, of agricultural land having an area in excess of five hundred acres (*cuerdas*), involves a violation of section 3 of the Joint Resolution of the Congress of the United States approved May 1, 1900. 5th.—In the event that the said trust could not properly be considered as a corporation, it appears from the said deed that the shares in the trusts, called 'shares of beneficial interests', are to be transferred to and held by the East Porto Rican Sugar Company, which is a foreign corporation, organized and existing under the laws of the State of Maryland, and which is to acquire the status of *cestui que trust* with reference to Eastern Sugar Associates, the latter thereby becoming practically an instrumentality of the former for the possession and enjoyment of the properties acquired in trust, and the right of the East Porto Rican Sugar Company to hold real property in Puerto Rico being limited by the Joint Resolution mentioned in the preceding subdivision 4th, such a limitation is effective not only against said corporation itself, but also against any other entity which in its place and for its benefit acquires any property in violation of the said

statutory provis'on; 6th.—The consolidation of the three hundred and ten estates and of the five centrals acquired by the said trust into a single estate extending from the District of Humacao to that of Guayama, through the towns of Cayey, Caguas, Juncos, Las Piedras, Naguabo, Yabucoa, Gurabo, Trujillo Alto and San Lorenzo, and to the adjacent islands, Vieques and Culebra, is contrary to law for the following reasons: A. The receiver appointed by the United States District Court for Puerto Rico had no authority to make the said consolidation. B. It does not appear nor has it been shown whether all those estates: (a) are known by a common name, or (b) constitute a body of mutually dependent properties, or (c) depend on a common center; 7th.—In view of the character and organization of the grantee trust and of the form or manner in which it is to hold the immovables that are conveyed to it, the legal title thereto to be held in favor and in the name of its representatives or trustees in trust for the benefit of its *cestuis que trustent*, whose rights are to be represented by shares transferable on the books of the trust, it is contrary to the fundamental principles of our civil legislation as regards the possession, use and enjoyment of real property in the exercise of the right of ownership, and to the mortgage legislation as regards the record of those rights; and the record is DENIED, further, specifically of the SALE and the MORTGAGE in so far as the same include and extend over the servitudes identified in the foregoing deed by the letters (c) and (f), under numbers (1–a) and (1–d), respectively, it appearing from the registry that the same were canceled by an order of the District Court of Guayama. By reason of the foregoing refusals a cautionary notice has been entered for the statutory period of 120 days in favor of Harry N. Baetjer, Clarence K. Bowie, Fred C. Boyce, Louis S. Zimmerman, Harry E. Henneman, Burt O. Clark and Eearle T. Fiddler in their capacity as trustees of Eastern Sugar Associates and not individually, and of The National City Bank of New York as to their respective purchase and mortgage rights, at folio 57, Vol. 80, of Cayey, property No. 2953, entry letter 'A'. There has been noted the curable defect of not appearing with entire clearness whether or not Central Defensa is included in the consolidation, as in certain parts of the foregoing deed it is stated that it forms a part of the consolidated estate, but its description has been omitted from among the units (*piezas*) which form said consolidated estate.''

With the petition of appeal the appellants filed a brief containing 18 pages which was answered by the registrar

with another brief consisting of 152 pages. The appellants then replied with a brief of 42 pages and the respondent filed a counter-brief of 32 pages.

Points (*b*) and (*c*) of the second ground of refusal, and the seventh ground as well, have been withdrawn from argument by the registrar himself. Therefore, there will be no necessity for considering them. The questions to be examined and decided are simplified and clarified in view of the concluding observations in the registrar's brief which we reproduce, as follows:

The first two grounds of the decision are predicated on the basis that the appellant trust is in Puerto Rico a foreign trust company. The first of such grounds challenges its capacity to do business in this island, and the second contests the validity of the title as being in contravention of certain provisions of Act No. 40 of 1928 (Session Laws, p. 234) regulating trust companies.

The third ground of refusal is alternative. In the event that the trust could not be considered as a trust company, the registrar understands that it should be regarded as a foreign corporation subject to the General Corporation Law of Puerto Rico.

The fourth ground of refusal challenges the capacity of the trust to acquire land in this island in excess of the limit established by the Organic Act and attributes to the said entity the status of a corporation, whether considered as a trust company or as a corporation, generally speaking.

The fifth ground asserts the applicability to the trust of the constitutional prohibition against the acquisition of land in excess of the limit fixed by law in so far as it may be inferred from the title-deeds that the said trust is an instrumentality of another corporation for whose benefit it functions.

By the sixth ground of refusal the consolidation of the various properties and centrals into a single estate is challenged.

■ Is Eastern Sugar Associates a foreign trust company?

The law which regulates these companies in Puerto Rico is Act No. 40 of 1928 (Session Laws, p. 234).

Its section 1 provides:

"This Act shall be known as the 'Trust Company Law' and shall be applicable to all corporations heretofore or hereafter organized for the purpose of engaging in trust-company business in Porto Rico."

Section 2 of the said act prescribes:

"The term 'trust company', for the purposes of this Act, means a domestic corporation formed for the purpose of taking, accepting and executing such trusts as may lawfully be committed to it, acting as trustee in the cases prescribed by law, receiving deposits of money and other personal property, and issuing its obligations therefor, and lending money on real or personal securities.

"The term 'foreign trust company', for the purposes of this Act, means a corporation organized for the purpose of engaging in trust-company business, under the laws of another Territory or State, or of the United States, or of a foreign country, whether or not operating a trust company at the place of its incorporation."

Let us examine the declaration of trust under which the entity involved was organized. It was executed in Baltimore, Maryland, on January 16, 1934, by Harry N. Baetjer, of Maryland, Fred C. Boyce, of Maryland, Louis S. Zimmerman, of Maryland, Clarence K. Bowie, of Maryland, Edward H. Burke, of Maryland, James A. Stevenson, of New York, and Earle T. Fiddler, of Pennsylvania, and it was formalized (*protocolado*) in accordance with its own terms, in Puerto Rico on March 27, 1934, before Notary Jorge M. Morales. A copy thereof certified by Notary Morales was presented in the registry together with the deed of purchase and sale, whose record was refused.

The said declaration begins thus:

"WHEREAS, simultaneously with the execution hereof, there has been paid to the Trustees the sum of one hundred dollars ($100) in cash, to be held upon the trusts of this Declaration; and

"WHEREAS, additional cash and securities, and other property, real, personal or mixed, of any kind or character whatsoever, may be hereafter from time to time transferred to or acquired by the Trustees to be held upon the trusts of this Declaration; and

"WHEREAS, it is contemplated that the Trustees, as such Trustees, may acquire sugar estates in Puerto Rico with their mills, railroads, cane lands and other appurtenances and cultivate such lands and manufacture sugar molasses and other products in Puerto Rico;

"Now, THEREFORE, this Declaration witnesseth and it is hereby agreed and declared, that the Trustees shall hold the said one hundred dollars ($100) and any other property and assets of every kind and nature, both tangible and intangible, at any time acquired or received by them as Trustees hereunder, including, without limitation of the generality of the foregoing, all choses in action and all rights, powers, and privileges arising out of or in connection with the said property or the business of this trust, together with the income therefrom and the proceeds thereof (all of the foregoing while so held being hereinafter usually called the 'trust estate') in trust in the manner and with and subject to the powers and provisions hereinafter contained concerning the same, for the benefit of the holders for the time being of the shares of this trust (hereinafter collectively called the 'Shareholders'), according to their respective interests and priorities."

Eleven articles then follow. The first one deals with the organization of the trust. It provides that the business thereof shall be conducted under the name of "Eastern Sugar Associates," such name and the words "this trust" wherever they may appear in the declaration, referring to the trustees as such and not to the trustees personally or to the officers, agents, or shareholders of the trust. Its principal place of business shall be located in Baltimore, Maryland. The trustees, subject only to the specific limitations contained in the declaration, shall have the absolute control, management, and distribution of the trust estate and the conduct of its business. Such business is specified in detail and it may be concluded that it concerns the production of sugar, from the acquisition of the lands and the planting of the cane to the installation and operation of centrals, the procurement of funds and entering into such contracts and operations as may

be necessary to attain its object agriculturally, industrially and commercially.

It is provided by Article II that, subject to the provisions of paragraph *M* of the preceding article, the title to the entire trust estate shall be transferred to and remain vested in the trustees. The number of the latter shall be not less than seven. They shall receive compensation for their services. One of them shall constitute Class C, one-half of the remaining number Class A, and the other half Class B. They shall hold office until their death, resignation, removal or legal disability. A Class A trustee may be removed by the action of the other trustees belonging to the same class. Similarly as to a Class B trustee. In case there should be only two Class A or Class B trustees, the power of removal may be exercised by East Porto Rican Sugar Co., a corporation of the State of Maryland, which in specified cases may also appoint new trustees to fill vacancies.

The third article deals with the officers, agents, and committees; the fourth with the meetings of shareholders; and the fifth with the shares and shareholders, its various paragraphs providing in part as follows: 1, "Shares in Trust Estate. The beneficial interest in the trust estate shall be in the holders from time to time of transferable shares of beneficial interest.—The shares of beneficial interest originally authorized which may be issued from time to time by this trust in the discretion of the Trustees without the necessity of additional authorization are as follows: 200,000 Preferred shares, of one dollar ($1.00) par value each; 300,000 Common shares, of one dollar ($1.00) par value each"; 3, "This Declaration may be amended from time to time, in the manner provided in Section 9.3, to authorize shares in addition to those originally authorized . . ."; 4, "Authorized shares of this trust may be issued from time to time in such amounts as the Trustees may determine, either for cash, services, securities, property or other value, or by way of stock dividend, or in exchange for other shares

or securities of this trust at the time outstanding . . .'';
6, ''Shares of this trust may, in the discretion of the Trustees be acquired by this trust either out of surplus or out of capital . . .''; 7, ''A register or registers shall be kept under the direction of the Trustees which shall contain the names of the Shareholders and their addresses as supplied by them, and the number of shares held by them respectively, and a record of all transfers thereof . . .''; 8, ''Every Shareholder shall be entitled to receive a certificate in such form as the Trustees shall from time to time approve specifying the number and class of shares held by him . . .''; and 12, ''Shares of this trust shall be personal property entitling the holders only to the rights and interest in the trust estate conferred by the law of Maryland and by this Declaration, and shall not give to the holders any right to receive or possess specific property of this trust for any purposes . . .''

It is provided in section 6.1 that: ''No partnership is created by this Declaration or by the operations of this trust hereunder. It is expressly declared that, as between the Shareholders, Trustees, officers and agents of this trust, a trust and not a partnership is deemed to be created by this Declaration irrespective of whether any different status may be held to exist as far as others are concerned or in any other respect, and that the Shareholders shall be deemed to hold only the relationship of *cestuis que trustent* to the Trustees, with only such rights as are conferred upon them as such *cestuis que trustent* hereunder.''

Article VII deals with surplus and dividends. It provides in part: ''The net profits and surplus of this trust may be determined for any and all purposes on the basis of a consolidated earnings statement and a consolidated balance sheet of this trust and its subsidiary companies, irrespective of whether or not this trust shall have actually received dividends or other payments from none, some or all subsidiary companies. . .''

The eighth article relates to notices, and the ninth deals with amendments, termination, and final disposition of the trust estate. Unless sooner terminated voluntarily in the manner which is provided, the trust shall continue until the death of the last survivor of the following persons: E. G. Baetjer, 2nd, and T. R. Fiddler, son of E. T. Fiddler, and shall not extend in any case beyond twenty-nine years, counted from the date of its creation.

Lastly, the tenth and eleventh articles treat of the interpretation of the instrument and of its protocolization in Puerto Rico.

Let us see now how the said entity has functioned once it was constituted.

In the deed of sale whose record has been refused there appeared Albert E. Lee, as Special Master appointed by the United States District Court for the District of Puerto Rico in the case of *Miller Fertilizer Company* v. *United Porto Rican Sugar Company*; the United Porto Rican Sugar Company, a domestic corporation, represented by its Vice-President Fernando Margarida; Trustees Baetjer, Bowie, Boyce, Zimmerman, Henneman, Clark and Fiddler of Eastern Sugar Associates; The National City Bank, represented by the officers of its branch at Caguas, García Cabrera and del Río; the East Porto Rican Sugar Company, a corporation of the State of Maryland, represented by its attorney-in-fact Fernando Margarida, and E. T. Fiddler.

On January 25, 1934, pursuant to an order of the Federal Court, the Special Master sold at public auction all the properties of the United Porto Rican Sugar Co., among them more than thirty thousand acres of land, which were awarded for a price of $3,500,000 to E. T. Fiddler on a bid made by him in accordance with a contract entered into on January 16, 1934, with East Porto Rican Sugar Co., Eastern Sugar Associates, and The National City Bank of New York. This contract is transcribed in full in the deed. It is a lengthy instrument and difficult to summarize. The National City

Bank of New York, the principal creditor of the United Porto Rican Sugar Co., made an agreement with the East Porto Rican Sugar Co., of Maryland, the new corporation organized for the purpose of financing with its own resources the contemplated deal, with Eastern Sugar Associates, the trust which would finally take charge of the properties and the business, and with E. T. Fiddler, who was to act as bidder at the said auction and thereafter transfer the property acquired to the trust Eastern Sugar Associates, the latter binding itself to deliver its preferred and common shares to the East Porto Rican Sugar Co., of Maryland, and to mortgage its properties in favor of The National City Bank of New York.

After the sale to E. T. Fiddler had been made, the latter in his turn transferred the properties to the trust, which mortgaged the same to the bank. The trust and the bank applied for the record of the multiple instrument finally executed, that is, deed No. 87 executed before Notary Morales, in the Registries of Property of Caguas, Humacao and Guayama. The notations entered at the foot of the instrument show that such registration was accomplished without difficulty in the first two registries above named. It was in the third of those registries where the record was refused, and thereupon the bank and the trustees appealed to this Supreme Court.

In the light of the applicable law, the trust deed of the said entity and the latter's operation, the conclusion must be reached that Eastern Sugar Associates was not organized to devote itself to a general trust business nor has it engaged in such business, and hence that it is not a trust company. It is in itself a trust, constituted in Maryland to be devoted to the sugar business in Puerto Rico.

Is it a corporation? The registrar himself characterizes it as one of the trusts designated in the American jurisprudence as *common law* or *Massachusetts trusts*. And what are these entities?

In the case of *Hecht* v. *Malley*, 265 U.S. 144, 146, Mr. Justice Sanford, speaking for the Supreme Court of the United States, expressed himself thus:

"The 'Massachusetts Trust' is a form of business organization, common in that State, consisting essentially of an arrangement whereby property is conveyed to trustees, in accordance with the terms of an instrument of trust, to be held and managed for the benefit of such persons as may from time to time be the holders of transferable certificates issued by the trustees showing the shares into which the beneficial interest in the property is divided. These certificates, which resemble certificates for shares of stock in a corporation and are issued and transferred in like manner, entitled the holders to share retably in the income of the property, and, upon termination of the trust, in the proceeds.

"Under the Massachusetts decisions these trust instruments are held to create either pure trusts or partnerships, according to the way in which the trustees are to conduct the affairs committed to their charge. If they are the principals and are free from the control of the certificate holders in the management of the property, a trust is created; but if the certificate holders are associated together in the control of the property as principals and the trustees are merely their managing agents, a partnership relation between the certificate holders is created. *William* v. *Milton*, 215 Mass. 1, 6; *Frost* v. *Thompson*, 219 Mass. 360, 365; *Dana* v. *Treasurer*, 227 Mass. 562, 565; *Priestley* v. *Treasurer*, 230 Mass. 452, 455.

"These trusts—whether pure trusts or partnerships—are unincorporated. They are not organized under any statute; and they derive no power, benefit or privilege from any statute. The Massachusetts statutes, however, recognize their existence and impose upon them, as 'associations,' certain obligations and liabilities."

The Supreme Judicial Court of Massachusetts, in the case of *Larson* v. *Sylvester*, 185 N.E. 44, 45, decided on March 29, 1933, through Mr. Justice Wait said:

"Speaking generally a trust is not a legal personality. With the exception later to be dealt with, it cannot be sued. It is represented by the trustee. He embodies it. He holds title. He deals with the property in which trust rights exist. Contracts with regard to the rights and property affected by trusts are the contracts of the trustee. He, in person, is liable upon them. He is not acting representative

or agent of another. He is acting for h'mself, but with fiduciary obligations to others. *Magallen* v. *Gomes* (Mass.) 183 N. E. 833; *Gardiner* v. *Rogers*, 267 Mass, 274, 278, 166 N. E. 763; *Philip Carey Co.* v. *Pingree*, 223 Mass. 352, 111 N. E. 857; *Mayo* v. *Moritz*, 151 Mass. 481, 24 N. E. 1083. Compare *Cochrane* v. *Forbes*, 265, Mass. 249, 255, 256, 163 N. E. 848; *Hussey* v. *Arnold*, 185 Mass. 202, 70 N. E. 87. It differs from a corporation or a partnership. The former is a legal person. The latter, in the law of Massachusetts, is an association of individuals united for transaction of business. The former can be sued as a body corporate in its own name. The latter must be sued, ordinarily, in the names of the partners.''

The Supreme Court of California, in the case of *Goldwater* v. *Oltman*, 210 Cal. 408, 415, 420, said:

''Upon an examination of the 'Agreement and Declaration of Trust,' which is attached as an exhibit to the answer of the defendant represented by Schweitzer & Hutton, it appears that it was by that agreement that Drascena Product'ons came into existence. It appears from this declaration of trust that the parties thereto attempted to create a type of business organization usually referred to as a Massachusetts or business trust. Inasmuch as this court has never directly passed upon the valid'ty and legal incidents of this type of business organ'zation, and inasmuch as it appears from the numerous briefs of *amici curiae* on file herein that there are a considerable number of such organizations in California, it seems well that some definite statement of their legal status be made at this time.

''These organizations, commonly denominated Massachusetts trusts, originated because of the hostility of some states toward corporations, and due to the des're of those organizing the same to secure some of the advantages that would be secured by incorporating without incurring the burdens and restrictions resulting therefrom. Due to statutory provisions in Massachusetts prohibiting corporations from dealing in real property, this type of organization reached its fullest development and most extensive use in that state, but, as will appear, has been adopted for use in many other states. The chief advantages of such organizations from the standpoint of those desirous of combining their wealth for business purposes are, that until recently they were, in most states, free from regulation, enjoyed freedom from corporation taxation, and its members enjoyed the freedom from personal liability that is imposed upon partners. This type of or-

640

ganization is nothing more than an attempt to use the old common-law trust for the purpose of carrying on business enterprises.

"Such a trust is brought into being by a declaration of trust, by the terms of which those desiring to invest their capital agree to the creation of a governing group of trustees, the powers and duties of this board being dependent on the terms of the trust agreement. The interest of each subscriber is evidence by transferable certificates, similar to shares of stock in a corporation and, in this state, subject to the scrutiny of the corporation department. The organization does not dissolve as does a partnership upon the transfer of any share, nor upon the death, insanity or brankruptcy of a subscriber. The trust agreement usually provides that the trustees and not the subscribers are the owners of the property, and the trustees are given, in a true Massachusetts trust, complete control of the management of the business. In the trust agreement it is always provided that the subscribers are not personally liable for any of the acts of the trustees a freedom from liability which, in this state, is even greater than that accorded to stockholders of corporations, except, since 1929, stockholders in limited corporations.

" *      *      *      *      *      *      *

"In the absence of controlling authority to the contrary, we can see no reason why such organizations with their limited liability should not be recognized in this state. It is true that the statutes of this state provide for limited liability in the case of limited partnerships and corporations, but we find nothing in those statutory provisions that manifests an intent to limit the types of business organizations which shall enjoy this privilege to the two types of business organizations enumerated. Section 2220 of the Civil Code expressly states that trusts in personalty may be created for any purpose for which a contract may lawfully be made. It is true that until 1929 certain limitations were placed upon the purposes for which trusts in real property might be created by section 857 of the Civil Code, but as stated before there was no such restriction in reference to trusts in personal property. (*Estate of Walkerly*, 108 Cal. 627; (49 Am. St. Rep. 97, 41 Pac. 772); *Estate of Hinckley*, 58 Cal. 457, 482; *Toland* v. *Toland*, 123 Cal. 140 (55 Pac. 681).) Even the restrictions on trusts in real property have now been removed by a 1929 amendment to section 2220 of the Civil Code. It seems clear to us that the settled legislative policy of this state is to lay no restrictions against the formation of trusts in personalty, but rather to leave open to such organizations the conduct of any lawful enterprise. The law of

trusts is just as much a part of the legislative policy of this state as the law of limited partnerships and corporations. It is true that trusts historically were not used for the purpose or running large business enterprises and were a development of the equity courts. The law, however, is not static, but is ever growing and expanding, and in recent years this form of handling property has been extended to nearly every field of activity. (Sears on Trust Estates as Business Companies, 2d ed., sec. 19; Wrightington on Unincorporated Associations & Business Trusts, 2d. ed., sec. 4.) Just because a new use is being made of the trust does not mean new principles of law are to be applied in determining the rights of the trustees, *cestuis que trust,* creditors of the trust or others that deal with the trust. (*Schumann-Heirk* v. *Folsom, supra.*) If this new extension of the use of trusts requires regulation, that is a matter of legislative and not judicial concern. Some states have seen fit to regulate this form of business enterprise by statute. (See Massachusetts Gen. Laws 1921, chap. 182; Massachusetts Acts and Resolves 1926, chap. 290; Oklahoma Sess. Laws 1925, chap. 56; Oklahoma Sess. Laws 1927, chap. 17; Wisconsin Laws 1923, chap. 431.)''

At page 1112, volume 16 of Fletcher's Cyclopedia of Corporations, Permanent Edition (1933), we find the following:

''As a general rule business trusts are created entirely by the act of the parties; they are not organized under, and do not depend on, any statute or statutory sanction for their existence, although in some states they are now recognized by statute, and in many states they are subject to governmental regulation under the statutes. They are, in law and in fact, unincorporated companies.

''The trust or trust estate is regarded as a legal entity for some purposes in some jurisdiction, but not in all.

''Business trusts are not corporations in any strict sense of the term, although they are treated as such for some purposes by the courts of different states. They are not creatures of statute, but voluntary associations of individuals, while a corporation can only exist by sanction of the legislature, and must either have received a charter or have been organized as a corporation under a general law.''

The cases cited by the registrar in support of his contention that the trust involved in the instant case is a corporation are based on different statutes than those in force

in this island. The respondent official himself, at page 58 of his main brief, says:

"Although it is true that neither our Corporation Law, nor our Organic Act, nor any other statute in this jurisdiction defines corporations in a similar manner as is done in the statutes of the above mentioned States, the fact is that in view of the privileges and immunities which our law grants to corporations, we may easily arrive at the conclusion that such privileges and immunities are not held either by individuals or by civil partnerships. There is no reason whatever why, notwithstanding the absence from our statutes of a categorical definition of corporations, we may not, in the light of the provisions of our laws, classify within their nature a foreign organization wh'ch enjoys the same privileges and prerogatives granted by our laws to such entities."

It is not possible to go that far by mere judicial interpretation, especially there being in force a statute such as Act No. 41 of 1928 (Session Laws, p. 294), to provide for the constitution of trusts, which was approved on the same day as Act No. 40, to provide for the incorporation and regulation of trust companies, and which now forms a part of the Civil Code, 1930 ed., p. 184, sections 834 to 874.

In that act, which has left subsisting the provisions of the Code set forth in Article III, Title III, relating to substitutions in trust (sections 710 to 715, 1930 ed.) and specifically provides that nothing contained in the act shall be understood to repeal or modify the system of inheritance established by the Code, a trust is defined as an irrevocable mandate whereby certain property is transferred to a person, named the trustee, in order that he may dispose of it as directed by the party who transfers the property, named the constituent, for his benefit or for the benefit of a third party, named the beneficiary (*cestui que trust*); and it is provided that a trust may be constituted by will or by act *inter vivos* upon property or any kind, real or personal, corporeal or incorporeal, present or future.

A trust by act *inter vivos* or upon real property must be constituted by a public deed, which must be recorded. A

trust may be singular or universal, pure or conditional, for a certain day, for a fixed term, or for the life of the constituent, of the trustee, or of the *cestui que trust;* but a trust providing for a usufruct, income, or pension in favor of an artificial person shall not last more than thirty years.

A trust may be constituted for any purpose not contravening the law or the public morals, and secret trusts are prohibited.

The constituent of a trust may be a natural or an artificial person and may create a trust in any form, for any purpose and upon any terms or conditions, not contravening the law or the public morals, and appoint not only one but two or more trustees and two or more *cestuis que trustent.*

The trustee also may be a natural or an artificial person, and shall have all the rights and actions inherent in full ownership, but not the power to convey or encumber the trust property, unless he has express authority therefor or unless the execution of the trust is impossible without alienating or encumbering the property.

The *cestui que trust* likewise may be a natural or an artificial person.

The act further provides in regard to the intervention of the courts, where necessary, and the termination of the trust; and it expressly directs that real property transferred by trust shall be recorded in the registry in the name of the trustee, as in the case of any other conveyance of ownership, and there shall be recorded as encumbrances on the property the provisions of the trust whereby the authority of the trustee to alienate or encumber the property be limited.

From the beginning the appellants have maintained that the above-mentioned act is the law which controls their case. It was our own Legislature which, since 1928, not only opened the field for the trust companies lawfully to estab-

lish themselves and develop their activities in our Island, but likewise for the pure trusts and even the business ones.

The legal personality of the trust in this case and the capacity of its trustees to acquire real property and to mortgage the same, appear from the instruments presented in the registry in accordance with the jurisprudence and the laws in force in Puerto Rico, and it can not be concluded that the trust in question constitutes a corporation which must be organized and function in accordance with the Trust Company Law or with the general corporation law of this island.

That being so, the first, second, third, and fourth grounds of refusal in the decision appealed from must fall to the ground.

Let us consider the fifth ground. Conceding, without holding, that from an examination of the declaration of trust, of the agreement included in the deed of sale, and of the sale itself, we might conclude within this administrative appeal that "the power behind the throne" is in this case really the East Puerto Rico Sugar Company, a foreign corporation, and that the trust was created merely to enable said corporation to acquire a larger area of land than that permitted by law, we would come face to face with what was doubtless the moving purpose of the entire decision appealed from, to wit: to oppose the violation of the Resolution of Congress which fixes its policy in regard to land holding in Puerto Rico. (Section 3, Joint Resolution, approved May 1, 1900, Revised Statutes and Codes of Puerto Rico of 1902, p. XXXIV.)

May the registrar, no matter how patriotic his intentions, how strong his intellect, how deep his learning or how extraordinary his effort made for the purpose, carry the problem into the sphere of his jurisdiction?

This question does not now come before this tribunal for the first time. It has already been decided in a negative sense in several decisions rendered after a careful study of the law and the facts.

The first of said decisions was *Compañía Azucarera de Carolina* v. *Registrar of Property,* 19 P.R.R. 143. The opinion of the court delivered by Mr. Justice Wolf was unanimous. There, after an examination of the statutes involved, including the Mortgage Law, and of the jurisprudence, it was said (p. 150):

"Thus it may be seen that a corporation limited by the law or by its charter has until the State acts every power and capacity that any other individual capable of acquiring lands possesses. The Corporation may exercise every act of ownership over such lands; it may sue in ejectment or unlawful detainer and it may demand specific performance. It has an absolute title against all the world except the State after a proper proceeding is begun in a court of law. The provisions of law in Porto Rico are no different. The Foraker Act does not prohibit the acquisition of land, but says that a corporation engaged in agriculture shall by its charter be restricted to ownership and control of not to exceed 500 acres of land.

"*     *     *     *     *     *     *

"The Organic Act in section 21 provides that the Attorney General will have all the power and discharge all the duties provided by law for an attorney of the Territories of the United States, in so far as the same are not locally inapplicable.

"And by section 771 of the Revised Statutes of the United States, among other duties it is made the duty of every district attorney to prosecute all civil actions in which the United States are concerned, and by other sections attorneys for the Territories are given the same powers as the United States district attorneys, so that its provisions would seem to determine who is the officer who shall look after the interest of Porto Rico and who shall bring actions to recover any fine or forfeiture.

"Moreover, by section 73 of the Political Code, as it has been amended by the laws of 1906, it is provided that the Attorney General upon the request of the Commissioner of the Interior, shall institute suits for the discovery of all immovable and movable property to which The People of Porto Rico may be entitled under the laws of escheat, or in and to which it has any other claim.

"So that ample provision is made in the law by which any violation of the Organic Act may be thoroughly investigated and prosecuted by the Attorney General. If there is any doubt how far the powers of the registrar extend, it is made clear by the provisions of

the Organic Act and by section 73 of the Political Code. The Attorney General is the exclusive officer in whom is confided the right to initiate proceedings for escheat or attach the right of a corporation to hold land. Without some such judicial or quasi-judicial proceedings a corporation might be deprived of some of its property rights without due process of law.''

Several months afterwards, in the case of *Compañía Azucarera* v. *The Registrar,* 19 P.R.R. 724, the court ratified its viewpoint, which it confirmed three years later in the cases of *Isabella Grove* v. *Registrar,* 24 P.R.R. 240; and *P. R. Leaf Tobacco Co.* v. *Registrar,* 24 P.R.R. 245.

Ever since that time, or more than twenty years ago, the Judicial Power has spoken with entire clearness and has shown the way. The Federal and the Insular Executive and Legislative Powers, and the community in general were advised. They are the ones who are called upon to act.

██ There only remains to be considered the ground of refusal relating to the consolidation and to the curable defect.

The properties involved belonged to the United Porto Rican Sugar Co., which had been placed in liquidation before the Federal Court. We know the agreement in accordance with which the said properties were acquired at public auction by E. T. Fiddler and later transferred to Eastern Sugar Associates. It was provided in that agreement that—

''1. In so far as the Bank may require, and as and when the Bank shall require, the real properties mortgaged shall be consolidated into one or more agricultural entities and recorded as such in the registries of properties, and each and every parcel of the properties mortgaged shall secure the entire obligation or such proportion thereof, as the Bank in its sole discretion shall determine.''

The bank insisted. All the interested parties agreed, and in order to facilitate the transaction, the receiver appointed by the court accordingly made the consolidation and it was stated in the deed of sale itself, at page 878, that such consolidation was made by the receiver at the

request and with the approval of Eastern Sugar Associates. Moreover, it may well be maintained that what was done in that connection was approved by the court.

The registrar contends that the consolidation could not be made, in the first place, because the receiver had no authority therefor, and also because the consolidated properties are not known by a common name nor form a body of mutually dependent properties nor do they depend upon a common center.

In view of the attendant circumstances, we think that the Receiver could act as he did. In the case of *Palou* v. *Registrar*, 19 P.R.R. 352, 355, this court said:

"The consolidation into one property of several properties previously recorded does not constitute an alienation thereof or an encumbrance thereon. Neither does it partake of the character of a contract, and although it is an *act* which involves a new record in the registry, it is a record of such nature as to affect only the registry itself and does not create, modify, or extinguish any right whatsoever."

The receiver acted at the request of the parties and with the approval of the court. The consolidation having been made at the instance and with the express acceptance of the present owner of the properties, it may also be regarded as made by the owner itself.

May such a large number of properties, non-contiguous many of them, situated in various municipalities and corresponding to various registries be consolidated? Even though an extreme case is involved, in our judgment, such a consolidation may be allowed.

Article 61 of the Regulations for the Execution of the Mortgage Law says:

"The following shall be recorded under a single number if the persons interested should so request, being considered a single estate, in accordance with article 8 of the law and for the purposes therein stated:

"First. Rural property known as farms, coffee plantations, sugar plantations, pastures, stock farms, etc., which form dependent or

joined property, with one or more building and one or more tracts of land, wooded or otherwise, even though they are not contiguous to each other or to the building provided they belong to the same parcel and to one person only, or to a number of persons *pro indiviso*, even though it be subject to charges or property rights, held by one or a number of persons, and composed of different sections or parts given in emphyteusis.''

The decisions of the General Directorate of Registries of Spain are to the effect that for a consolidation it is required that there should be unity of ownership, a common name for all the properties; that the latter should constitute a body of mutually dependent properties and in addition that they should be dependent upon a common center.

We have already said enough with regard to the unity of ownership. All the properties belonged to the United Porto Rican Sugar Co. and are now owned by Eastern Sugar Associates.

As regards the common name, the appellants cite the deed of sale itself, p. 774, where at the commencement of the description of the consolidated property it is said:

"RURAL: A group of dependent properties designated under the name of 'Eastern Sugar Estates'.''

To show that the properties form a group of mutually dependent estates subject to a common center, they invoke the clause of the said deed appearing at pages 772 to 774 thereof, which says:

". . . that in view of the fact that all the properties described above in Section First of this deed, composing *piezas* numbered from (1) to (91), both included, although not contiguous, constitute a single body of interdependent rural properties consisting of a sugar estate of centrals named Central Pasto Viejo, Central Juncos, Central Santa Juana, Central Defensa and Central Cayey and their dependent lands dedicated to the growing and cultivation of sugar cane and the manufacture thereof into sugar and molasses, and the shipment of said products, forming and operated as a single agricultural and industrial enterprise, and exercising the right conferred by Article Eight of the Mortgage Law and Article Sixty-one of the Regulations

of said Law, hereby groups, consolidates and merges all the said properties into one entity or consolidation and agrees that it shall be recorded in the corresponding Registries of Property as a single estate under a single number as described below, and instructs and directs the corresponding Registrars of Property to record the same as a single estate under a single number so that it may be considered as one single property or estate for all legal purposes and the said properties having been herein so grouped, consolidated and merged constitute the rural estate described in the Spanish Language, as follows."

In their reply brief (p. 46) to the main brief of the registrar, they add:

"In passing upon an instrument, the registrar must confine himself to the contents thereof. As regards the consolidation he should be confined to what the deed sets forth and what appears from the registry, without taking into consideration his own knowledge of Geography.

"Had there been any means, other than the instrument itself as in this case, of establishing the industrial and administrative unity of Eastern Sugar Associates, it would have been extremely easy for the appellants to do so. We could have shown that all the consolidated properties have been operated as a single estate, since from the registry itself there appear agricultural loan contracts entered into between the United Porto Rican Sugar Co. (of Porto Rico) and the National City Bank, wherein all the consolidated properties were affected. We could have shown also how all the properties are connected by railroad, ships, or motor vehicles, owned by the trust; how cane harvested on land at Vieques, may be ground in any of the Centrals, 'Cayey', 'Defensa', 'Juncos', 'Pasto Viejo', or 'Santa Juana', and how an ox, the property of the trust, which has worked throughout the grinding season at Cayey may be sent in the summer to pasture on land at Vieques. Of course, to present those facts a public hearing before the registrar would have been necessary. From a reading of all the instruments copied into the deed, the unity required by the Mortgage Law for a consolidation of estates is clearly inferred."

The curable defect does not exist. It does not appear from the deed that it had been the intention of the parties to include in the consolidation the estate on which the "Central Defensa" is located. The said estate is not described among those which form the consolidation. The appellants

maintain that if the name of said Central was mentioned in the consolidation, this was done because it was considered "necessary in order to identify the consolidated estate, since the properties located around the said 'Central Defensa' and which form with the latter a unit within the land of Eastern Sugar Estates, were consolidated," and we find no valid reason for holding the contrary.

For the reasons stated, the decision appealed from must be reversed and the record sought ordered.

Mr. Justice Córdova Dávila took no part in the decision of this case.